FILED
1/12/2023 3:23 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CC-23-00243-C

NO. _____

| | | |
|---|---|---|
| **MARGIE ANN ESCAMILLA** | § | **IN COUNTY COURT** |
| | § | |
| | § | |
| **V.** | § | **AT LAW ___** |
| | § | |
| | § | |
| **SERVITAS, LLC** | § | **DALLAS COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **COMES NOW MARGIE ANN ESCAMILLA,** Plaintiff in the above-styled and captioned cause, and complaining of **SERVITAS, LLC,** Defendant, and for cause of action would respectfully show the Court and Jury as follows:

## I. DISCOVERY CONTROL PLAN AND CLAIM FOR RELIEF

1.1    Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4, and hereby requests that the Court enter a discovery control order under Rule 190.4.

1.2    Plaintiff seeks monetary relief between $250,000 and $1,000,000, including damages of any kind, penalties, court costs, expenses, prejudgment interest, and attorney fees.

## II. PARTIES

2.1    Plaintiff **MARGIE ANN ESCAMILLA** ("Plaintiff" or "Escamilla") is an individual residing at 2801 Brazos Blvd #10301, Euless, TX 76039. The last three digits of Plaintiff's driver's license number are 118. The last three digits of Plaintiff's Social Security number are 320.

2.2    Defendant **SERVITAS, LLC** ("Defendant" or "Servitas") is a Texas domestic limited liability company, which may be served with process upon its registered agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136.



EXHIBIT
C

### III.  JURISDICTION AND VENUE

3.1     Jurisdiction and venue of this action are proper in this Court, in that Plaintiff's damages

exceed the minimum jurisdictional limits of this Court, and her causes of action accrued in whole or

in part in Dallas County, Texas.

### IV. FACTS

4.1     Plaintiff Margie Ann Escamilla brings this lawsuit against her former employer – Servitas

LLC – for sexual harassment and retaliation under Texas Labor Code Chapter 21.

*Background and Qualifications*:

4.2     In 2016, Escamilla graduated from Texas State University in San Marcos with a Bachelor of

Arts in Public Relations / Mass Communications. During college, she had worked in Austin, Texas

as a Public Relations Assistant for Circuit of the Americas (2013-2016), and for Disney ESPN

Media Networks as Public Relations Coordinator and Press Officer for the Summer X Games. In

2016 and 2017, Escamilla served as Marketing Coordinator for Quisitive in Dallas, Texas.

*Marketing Director at Servitas, LLC*:

4.3     On June 27, 2018, Servitas, LLC, hired Escamilla as its new Marketing Coordinator.

Escamilla was (and is) highly qualified in the area of marketing and public relations, and her skills

served her well at Servitas. By December of 2018, Escamilla had received her first Annual

Performance Review, in which her immediate supervisor, Carmen Wolff, wrote about her:

> Margie has been an incredible addition and asset to this team and the company. She
> took off with the position and has made it completely her own, constantly evolving
> the position and her efforts as her experience and knowledge base develop. Margie is
> a true team player and is always bringing ideas to the table to improve the
> department, the products produced, and the Company's client-facing image and
> presence.
>
> Margie is on a quick trajectory to evolve her position within the department and
> Company. She has shown strong leadership skills, marketing intuitiveness, a
> knowledgeable collaborator, and a mature, professional client-facing presence. As

her industry knowledge evolves, her capabilities to interact with potential clients in a more business development manner will definitely elevate her ever- increasing value to the Company.

...

Margie is a talented professional who has already taken positive steps in evolving the Company's industry presence. I value her personal and professional ethos and completely trust her to represent this team and the Company.

4.4     Ms. Wolff signed Escamilla's evaluation December 4, 2018. (*See* Exhibit A).

*Sexual Harassment Incident in California*:

4.5     Just prior to the evaluation discussed above, on November 15, 2018, Escamilla was staffing the Community College League of California Annual Convention in Palm Springs for Servitas. At this event, Escamilla was sexually harassed by Steven Gonzalez, a lawyer and outside legal representative for Servitas, along with a Servitas senior-level Supervisor named Blair Tavenner. While David Braedden, Mr. Tavenner, and Escamilla were there working the conference for Servitas, Escamilla was introduced for the first time to Steven Gonzales, who she understand was there to assist at the conference as an expert on a closing being discussed at the Convention. Mr. Gonzales began by openly staring at Escamilla to the point of making her uncomfortable. While on the conference floor, Mr. Gonzales rubbed Escamilla's arm and back multiple times, which David Braedden witnessed. At the reception which followed immediately after, Mr. Gonzales and Mr. Tavenner had a few drinks, and Mr. Gonzales became more aggressive toward Escamilla, touching her more often.

4.6     When Escamilla rode back to the hotel with Mr. Gonzales and Mr. Tavenner, Escamilla continued to feel uncomfortable, because Mr. Gonzales was driving, and it appeared that both he and Mr. Tavenner were too drunk to be driving. Seemingly out of the blue, Mr. Tavenner asked me if Escamilla had "brought [her] bikini," which made her feel even more uncomfortable. The men then

made comments to Escamilla about "getting in a hot tub," which she certainly did not want to do with either of them, but she was concerned for her job and her safety, so she did not know how to respond. Escamilla then learned Mr. Gonzales and Mr. Tavenner were going to another destination, so she said she only wanted to go to her hotel. As Mr. Gonzales and Mr. Tavenner were dropping her off, Mr. Gonzales got out to help Escamilla with her bag. Gonzales touched Escamilla again, and this time he kissed her cheek and pulled her in close to his body. Thankfully, Mr. Gonzales and Mr. Tavenner left Escamilla at the hotel, they made no further references to the incident, and Escamilla did not have to see Mr. Gonzales again at that conference.

*Report of Sexual Harassment*:

4.7     Escamilla reported this incident promptly to her supervisor, Ms. Wolff, who reported it on or about November 20, 2018, to Servitas' Senior Vice President for Administration and Asset Management, Denise Hauck, who then interviewed Escamilla on November 21, 2018. (*See* Exhibit B).

4.8     Ms. Hauck told Escamilla she was very sorry this had happened to Escamilla, but she also told Escamilla in the same conversation, "I'm surprised this is the first time this has happened to you, and it likely won't be the last." Escamilla told Ms. Hauck she never wanted to be the only woman around Mr. Gonzales going forward. Hauck assured Escamilla that Mr. Gonzales lived and officed in Florida and rarely came to Servitas' office in Irving, Texas. Both Hauck (and later Ms. Diaz – the Director of HR – told Escamilla Mr. Gonzales would not be allowed to contact Escamilla or be around her in the Dallas office where she was working. Hauck said she would also speak with Mr. Tavenner in an effort to make Servitas a safe place for Ms. Escamilla and other women to work. Ms. Hauck spoke with David Braedden, who confirmed he had seen the touching at the conference, but he had ridden back to the hotel in a different car and had not heard the "bikini/hot tub"

harassment or seen Mr. Gonzales' unwanted and uninvited kiss. Rather than handle the issue herself, or hand it over to Diana Diaz, Servitas' Director of Human Resources, it appears Ms. Hauck instead handed the incident over to Servitas' President, Rafael Figueroa, who claimed to have "appropriately addressed" the situation with both Mr. Gonzales and Mr. Tavenner.

4.9     Escamilla subsequently learned, however, that Mr. Figueroa – a married man – was himself accused of – and Servitas sued over – sex discrimination and sexual harassment by Escamilla's predecessor, Ms. Lindsay Johnson – a 31-year-old single mother. Ms. Johnson became Servitas' Marketing Director in 2012. By December of 2013, she became Servitas' only female Vice President, when Servitas promoted her to Vice President of Marketing. Among other claims, Ms. Johnson alleged that Mr. Figueroa allowed all male Vice Presidents to participate in Servitas' 401K plan, while lying to Ms. Johnson for two years and telling her Servitas had no such plan, preventing her participation. Even then, Ms. Johnson had to fight for over a year before she was allowed to participate. Mr. Figueroa also subjected Ms. Johnson to different standards than the men regarding her working hours, working from home, remote access, and other issues.

4.10    More pertinent to the fact that Mr. Figueroa had taken control of Escamilla's sexual harassment report, however, is the fact that Ms. Johnson alleged Mr. Figueroa had objectified her and failed to treat her with professional respect. On more than one occasion, Mr. Figueroa had instructed Ms. Johnson to attend meetings with clients because he needed a "token female." Prior to one meeting, he ordered her to take off a sweater because it was "too bulky." Despite her status as Vice President, he often relegated her to a secretarial role because she was the only woman – making her set up meeting rooms or pass out paperwork to attendees or serve drinks or hor d'oeuvres to male executives on Figueroa's private jet. According to Ms. Johnson's lawsuit, Mr. Figueroa insisted Ms. Johnson apply sunscreen to his back and chest, because his wife wasn't there

to do it, and he told Ms. Johnson, who was blonde, that he "needed a blonde woman to take on vacation to a deserted island without his wife knowing about it." (*See* Exhibit C).

*Servitas Breaks Confidentiality and Takes No Action*:

4.11    After November of 2018, Servitas never followed up with Escamilla about the results of her sexual harassment report, and Escamilla soon became concerned that she was not going to be protected at Servitas. First, Escamilla had reported the sexual harassment confidentially to her supervisor, Carmen Wolff, and Servitas' VP, Ms. Hauck, and was told her report would be kept in the strictest confidence. But two weeks later, around November 29, 2018, Ms. Wolff joked about Escamilla's sexual harassment report with Wolff's husband and made the comment to Escamilla: "Did I choose Margie to attend the Dallas Cowboys Football game to make up for her getting sexually harassed?" Second, by February of 2019, Escamilla also discovered Ms. Wolff had openly discussed Escamilla's sexual harassment report with another employee – Steven Robbins.

4.12    On February 21, 2019, Escamilla saw that, for the 2nd or 3rd time in the same week, Mr. Gonzales was physically present in the Dallas office. Gonzales was walking around in Escamilla's work area, appearing to visit with other employees. This concerned Escamilla, especially after her supervisor had openly discussed Escamilla's sexual harassment report with her husband and another Servitas employee, and because Escamilla had never heard anything from Servitas about the outcome of her sexual harassment report. Escamilla immediately sent an E-mail to Trey Verbick (CIO)[1], Diana Diaz (HR) and Denise Hauck (COO), requesting a meeting about Mr. Gonzales' being in the Dallas office. (*See* Exhibit D).

4.13    Of the three people Escamilla reached out to, Ms. Hauck was the only one in at the time. She invited Escamilla to sit in her office and talk until the others arrived. Ms. Hauck acknowledged to

Escamilla that Servitas had "dropped the ball" on Escamilla's sexual harassment complaint, and that this was "on us." When Mr. Verbick and Ms. Diaz arrived, Escamilla also reported Ms. Wolff's inappropriate handling of Escamilla's confidential HR employee information and the previous November 2019 incident (Ms. Wolff talking about Escamilla's sexual harassment report to Wolff's husband) to Ms. Hauck (VP), Ms. Diaz (Director of HR), and Trey Verbick (Servitas' Chief Information Officer).

4.14    The meeting with Ms. Hauck, Mr. Verbick and Ms. Diaz went very differently from Escamilla's conversation with Ms. Hauck before the meeting. Ms. Diaz informed Escamilla, "Servitas will not stop doing business with Steven G," and that arrangements could be made for Escamilla to use the side door to enter and exit, while Mr. Gonzales could enter and exit through the front door. But, Ms. Diaz said, Escamilla would need to stay on one side of the building while Mr. Gonzales was on the other side. Escamilla asked how that was fair to her, since she was the employee and Mr. Gonzales was external? Not to mention the fact that it was Mr. Gonzales' behavior – not Escamilla's – that was inappropriate and had caused the problem. They all agreed (with each other) that this was "not a big issue," and Escamilla's choices were to use the side door when Gonzales was in town for meetings. Escamilla asked if they would conduct meetings with Mr. Gonzales off site, so she would not have to see him at her workplace. They again said they would not make those accommodations just because Escamilla "was uncomfortable." They made no acknowledgement of Mr. Gonzales' actions – only what they would or wouldn't do just because Escamilla "was uncomfortable."

*Inappropriate Communications made by Trey Verbick*:

4.15    Mr. Verbick became Escamilla's supervisor after Ms. Wolff. Throughout the time he

1 Ms. Wolff had resigned for reasons still unknown to Escamilla, and Mr. Verbick was now Escamilla's immediate supervisor.

supervised Escamilla, Mr. Verbick often made offensive remarks, and he openly discussed Escamilla's personal life in front of other team members. Mr. Verbick would say things like:

> "Act like a dumb blonde" or "Play dumb and lowball a number so we get a better deal on a contract."

> "Since you live at home" (with her parents), you should be able to do this and that."

> "Do all of your siblings still live at home too?"

> "Margie, I'm sure you know plenty of family members who are in the gardening industry" (apparently referring to the fact that Escamilla is Hispanic).

*Depositions in Lindsay Johnson's Lawsuit*:

4.16    Throughout 2019, Escamilla continued to work hard for Servitas and performed her job well. During the time period from September 2019 to December 2019, Ms. Johnson's lawsuit against Servitas was progressing, and Servitas' lawyers began discussing with Escamilla the fact that Excamilla's deposition had been requested. Servitas' lawyers were aware of Escamilla's sexual harassment report and how it had been handled, and Escamilla was also forthcoming with them and the truth about it. Escamilla was not told the reasons, but ultimately her deposition never happened. It appears another employee's deposition (where Escamilla was supposed to sit in) also never happened. For reasons Escamilla was also never told, activity around Ms. Johnson's case seemed to die down in early 2020, as far as Escamilla was aware. However, Escamilla was still never told the outcome of her own HR report regarding Mr. Gonzales, and Servitas began to treat her differently, and to isolate her from her co-workers.

*Isolation, Lack of Support, and Termination*:

4.17    After her sexual harassment report, and especially when she spoke up again after no action had been taken to protect her from her harasser, Servitas began treating Escamilla differently. For example, during her November 2018 evaluation, Escamilla had expressed her long-term goal of

improving herself by attending graduate school:

> My long-term goals are to reach a managerial position that can set me on a path to
> attain a director level position to lead marketing and communication efforts. To
> accomplish this my goal is to attend graduate school to earn a master's degree in
> business marketing to further my knowledge and abilities to lead a department for an
> organization. Ideally, I would engage in asking the company for tuition assistance to
> invest in me to go back to school while maintain full-time work status.

4.18    Escamilla's supervisor's response at that time was that the company was very interested in

investing in Escamilla's personal career and professional development:

> A plan and process is currently being created by leadership to implement career paths
> for employees. A leadership path is currently being considered for Margie.

(*See* Exhibit A).

4.19    In 2019, after she'd reported sexual harassment, Escamilla followed up about tuition

reimbursement, and HR never responded. Escamilla understood, however, that the program was

available. In 2020, Escamilla followed up with Ms. Diaz (the Director of HR) about tuition

reimbursement. Ms. Diaz claimed at that time that Servitas "would not pay for an MBA," and that

Servitas' tuition reimbursement program really only existed for financing certifications. Escamilla

asked again about the program by E-mail, and this time she attached the tuition reimbursement

section from Servitas' Employee Handbook. At that point, Escamilla did get approval from her

supervisor, Trey Verbick, and Ms. Hauck (VP). Escamilla was given a contact that stated Servitas

would reimburse her after a semester of an average of "B" or better. However, Escamilla's position

was terminated in November of 2020 before she ever had the opportunity to take advantage of this

program Servitas had seemed so eager for her to know about in November of 2018, before she had

reported sexual harassment.

4.20    In March of 2020, Escamilla took some PTO (paid time off) days she had earned to go on

vacation to Amman in Jordan. Escamilla left right before COVID-19 hit the US. While she was out

of the country, borders began to close. Escamilla was then stuck in Amman, Jordan due to border closures and unable to return to the US. She kept in touch with Mr. Verbick (who was now her supervisor), and Mr. Verbick and Escamilla agreed on a work schedule she could stick to in order to keep her job. However, Mr. Verbick decided to cut off Escamilla's VPN access to the company's server and proceeded to tell her she had to "figure out" how to complete her job tasks without it. Escamilla had to ask other co-workers to cover some of her tasks for her, since she was unable to get remote access. Escamilla's workload was not adjusted because of this, and she was warned if she did not complete these tasks, she would fall below acceptable guidelines. Escamilla was not aware of any other employee who was required to meet normal productivity without being in the office or having VPN access.

4.21    Escamilla did finally return safely to the US, and once she made it back to the DFW area she was able to work from home as others were due to the Dallas office's not being open. Everyone in the office worked through COVID-19, sometimes in person at the office, and other times remotely from home when outbreaks had occurred in Servitas' building. Later in the year, Servitas provided an optional voluntary work from home order, and some employees worked in person while others (including Escamilla) worked remotely from home. Escamilla did not receive any complaints or write ups about the quality or quantity of her work. However, in early November of 2020, Escamilla tested positive for COVID-19, and she asked for the reasonable accommodation of taking leave as needed to recover, and/or continuing to work from home as she was able. Instead, on or about November 12, 2020, the company terminated Escamilla's employment, without giving her a reason

4.22    Based on these facts, Plaintiff will show the Court and Jury that Servitas, LLC – had it not needed to keep Escamilla from speaking with Ms. Johnson's lawyers when her lawsuit was active and she was likely to be deposed – would have terminated Escamilla in 2019 in retaliation for having

reported sexual harassment in 2018, and for following up in 2019 when nothing was done about it. For whatever reason, by late 2020 the company was apparently no longer concerned about Ms. Johnson's lawsuit, and the evidence will show Escamilla was terminated in retaliation for reporting sexual harassment under Chapter 21. Retaliation (for reporting and opposing a discriminatory practice such as sexual harassment) is a violation of Chapter 21 of the Texas Labor Code.

## V. CAUSES OF ACTION

### A) Retaliation for Opposing Discrimination on Basis of Sex:

5.1     Under **Texas Labor Code §§21.051**, an employer commits an unlawful employment practice if because of sex, the employer:

> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

5.2     Under **Texas Labor Code §21.055,** an employer commits an unlawful practice if the employer retaliates or discriminates against a person who opposes a discriminatory practice, including reporting discrimination on the basis of sex in the form of sexual harassment.

### B) Exhaustion of Administrative Remedies:

5.3     On March 10, 2021, Plaintiff timely filled out and filed an administrative charge questionnaire with the Texas Workforce Commission's Civil Rights Division, alleging Defendant had discriminated against her on the basis of her gender and age, and alleging Defendant had retaliated against her for having complained of such discrimination.

5.4     When Defendant failed to resolve this issue in the TWC's investigation, the Texas Workforce Commission issued Plaintiff a letter November 30, 2022, notifying Plaintiff of her right to file

this private civil action. Plaintiff has filed this action within sixty (60) days of the date she received TWC's right to sue letter, and within two (2) years of the date on which she first contacted the Texas Workforce Commission.

**C) Plaintiff's Private Cause of Action:**

5.5     **Texas Labor Code § 21.254** expressly provides that "[w]ithin 60 days after the date a notice of the right to file a civil action is received, the complainant may bring a civil action against the respondent."

5.6     **Texas Labor Code § 21.258** expressly provides that this Court may use its equitable powers to award back pay and court costs.

5.7     **Texas Labor Code § 21.2585** expressly provides that this Court may award compensatory damages, which may include back pay, front pay, other pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and punitive damages.

5.8     **Texas Labor Code § 21.259** expressly provides that this Court may award attorney's fees and court costs, including reasonable expert witness fees.

**D) Damages:**

5.9     Plaintiff hereby asks this Court to award her back pay, front pay and other pecuniary losses, loss of contributions to social security and medicare (if any), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, punitive damages, attorney's fees and court costs, including reasonable expert witness fees.

## VI.  CONDITIONS PRECEDENT

6.1     All conditions precedent to the filing of this suit have been met.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to

appear and answer herein, that Plaintiff be granted judgment against Defendant for her damages as they may appear upon the trial hereof, reserving her right to amend these pleadings to conform to the facts as they may develop, costs, pre-judgment and post-judgment interest at the maximum rate allowed by law, whether equitable or statutory, and for such other and further relief, special or general, legal or equitable to which Plaintiff may show herself justly entitled.

Respectfully submitted,

**TAYLOR LAW FIRM**

Walter L. Taylor
State Bar No. 19727030

*taylorlawfirmdfw@gmail.com*

6630 Colleyville Blvd., Ste. 100
Tel: (817) 770-4343
Fax: (512) 474-6700

**ATTORNEYS FOR PLAINTIFF
MARGIE ANN ESCAMILLA**



# ANNUAL PERFORMANCE REVIEW

# Margie
# Escamilla

CONFIDENTIAL

Discuss your performance this past year. What has and has not been achieved and why?

Since joining Sevitas in June of this year I have been aiming to achieve goals set by the team, management, leadership and myself. My position is heavily involved in coordination of marketing assets, conferences, conventions and supporting each department of leadership. My accomplishments have included the following:

- Website Migration: Revamped website layout, worked with developer to improve visual appeal, adding services, maintained personnel and news/ blog articles. Continuing to evolve the site to reach target audience. Checking analytics bi-weekly, improving SEO AdWords searches.
- Conference/Project logistics Coordination: Successfully support the business development team for the P3 Higher Ed Summit and the CCLC Convention in Palm Springs, CA. Support included booking travel, hosting team meetings, creating roundtable discussion and booth set up/ monitoring. Completed and coordinated the OCC ground break ceremony by creating email blast, email list, invites, working with schools key POC on communication to get the message out. Ordered souvenir gifts and created/assembled hard hats.
- Proposal Support: Assist with proposal production by proof reading, creating cover pages, binding/ laminating, assembling booklets and created shipping label and shipped packages to location.
- Marketing/ Branding: Defining final logo and tagline, creating assorted logos and rebranding collateral such as literature, tradeshow items, email signatures, and promo items. Maintained full support to the development team to accomplished state letters going out to university and college key personnel to help build relationships. Letters to Colorado, California, and Arkansas have been sent via mass email. I maintained analytics and give the development team updates. Maintaining and monitoring the corporate LinkedIn page by posting current news at least once a week and growing the number of followers from 228 to 278 over the course of five months.
- Corporate Communications: Interviewing key stake holders to narrow down Servitas Mission, Vision and Values. Publish press release on topics such as grand opening of Mill Creek Hall, OCC ground break, personnel and business development updates.

The following have not been fully accomplished due to prioritization or waiting for final approval.
- Corporate newsletter: Target date to publish is January 2019, continuing to collect information and assets to write about. Continuing to add to the growing recipients list to complete a current master email list.
- Proposal filing system: The organization of the filing of past and current proposals has not been fully cleaned up or accomplished this is due to prioritization of other necessary items to be done first.
- Article /AD submissions to SHB journal: Only one AD has been purchased for publication and three articles have been sent that has received visibility both online and in print, but full cover stories were not shown due to cost and purchasing of ad space.
- Agendas: Setting up proper schedules for monthly social posting and quarterly events logging.

SERV-200521

**What would you like to achieve at work this coming year? Set personal objectives for the next year.**

This year I would like to accomplish the following goals and bring new ideas to the table for our marketing department and corporate communications.

- Implement on boarding deck- The intent is to improve new hire communication, on boarding process will help new hires feel welcomed by creating a stellar visual presentation overview of who Servitas is and what employees will have to look forward to by join our team. Give detailed list of HR needs, IT set up and login, send welcome announcement to the organization.

This will be accomplished in coordination with Diana Diaz and the legal department. Diana, will oversee content and Margie will oversee the necessary edits, layout, and design.

- SharePoint: Allow for cohesiveness to bringing the organization together and kept up to date on projects and development, construction and demand study information. Be a part of creating the visual layout.

With support from Margie, Carmen Wolff will oversee the SharePoint architecture development. Margie will be responsible for all post-development activities.

- Website: Find a developer to comfortably work with to accomplish goals to bring a new look and refresh to the current website.

Margie will determine process for obtaining new Website developer and spearhead the project.

- Launch Campaigns: Target the Servitas brand both externally and internally. Target our audience and push a business development/management campaign.
- Philanthropic Team: Get a corporate giving committee/ team together to implement quarterly community involvement.

Although still in development, the company intends to donate 8 hours annually per employee to dedicate to offsite charitable work during regular work hours.

- Corporate Swag: Budget for new company shirts, jackets and hats for employees to purchase or get a portioned covered by the company. Maintain branding appeal internally to get on board with new logo and branding.
- Development: Get team involved in speaking events such as panels, roundtables, forums to get recognized and associated with the Servitas name and promote company involvement during events. Gain exposure for our brand through key ambassadors.
- Submit Servitas to be a part of leagues, memberships, rankings and such to gain visibility and credibility when competing in proposals. Get Ad space in Student housing journals and updated marketing manual.

Margie will oversee all other goals not specifically addressed above.

SERV-198878

Use this space to discuss and note your long-term career plan and aspirations. Note items that you need from Servitas to achieve your career goals.

My aspirations are to further my learning and skill set abilities in marketing. I want to learn how to best support business development with new strategies, techniques and improve a Go- to market approach to campaigning. The tools I would need to accomplish this would be attending marketing conferences to help learn and engaged trends, adapt to best practices and tools to bring in house and implement. Others would include attending workshops to learn new technologies to use to improve tracking systems and AI-Marketing.
A budget is in development for training. Please locate specific conferences, classes, or training you would like to attend and I will work on necessary approvals. Corporate lunch-and-learns will be implemented in 2019.

My long-term goals are to reach a managerial position that can set me on a path to attain a director level position to lead marketing and communication efforts. To accomplish this my goal is to attend graduate school to earn a master's degree in business marketing to further my knowledge and abilities to lead a department for an organization. Ideally, I would engage in asking the company for tuition assistance to invest in me to go back to school while maintain full-time work status.
A plan and process is currently being created by leadership to implement career paths for employees. A leadership path is currently being considered for Margie.

Supervisor's comments on the performance this past year and next years goals:

Margie has been an incredible addition and asset to this team and the company. She took off with the position and has made it completely her own, constantly evolving the position and her efforts as her experience and knowledge base develop. Margie is a true team player and is always bringing ideas to the table to improve the department, the products produced, and the Company's client-facing image and presence.

Margie is on a quick trajectory to evolve her position within the department and Company. She has shown strong leadership skills, marketing intuitiveness, a knowledgeable collaborator, and a mature, professional client-facing presence. As her industry knowledge evolves, her capabilities to interact with potential clients in a more business development manner will definitely elevate her ever-increasing value to the Company.

My notes on Margie's goals are highlighted above in the goals section.

Margie is a talented professional who has already taken positive steps in evolving the Company's industry presence. I value her personal and professional ethos and completely trust her to represent this team and the Company.

Associate's Signature:

Margie A. Escamilla

Date:   November 20, 2018

Supervisor's Signature:

Carmen E. Wolff

Date:   December 4, 2018

# Employee Incident Report



**For responding supervisor to complete.**
**Recommended to complete form within 24 hours of incident.**

| Employee Name: | Margie Escamilla | Date of Occurance: | Thursday, November 15, 2018 |
|---|---|---|---|
| Location of Incident: | Palm Springs, CA at Community College conference | Time of Occurance: | Throughout afternoon and evening |

*Check all that apply

| | | | |
|---|---|---|---|
| | Injury | Other | |
| | Theft | | |
| | Drugs/Alcohol | | |
| X | Harrassment | | |
| | Assault | | |

Was there Property Damage? (Yes/No) | No | Estimated Cost: | NA

**SUMMARY OF INCIDENT: (Include photoscommunication reports if available.)**
NEVER DISCUSS WHO IS AT FAULT OR ISSUE A COPY OF THE REPORT TO THE EMPLOYEE.
Be objective. Give details in concise terms: what occurred, when, where, by whom, and why - Identify all people involved and list all witnesses with points of contact if not employees. If theft, state what was taken and a description if possible. Give all facts that would assist another to investigate. If additional writing space is needed, use the back of this form, and/or attach additional paper.

As I was leaving for the day on November 20, it was reported to me by Carmen Wolff, that while working the California Community College Conference in Palm Springs, Margie Escamilla was made to feel uncomfortable by Steven Gonzalez, an outside legal represtative for Servitas, and Blair Tavenner. Carmen is Margie's direct supervisor. I reported the event to Rafael Figueroa that evening once I arrived home. We discussed my doing an investigation the next day. Margie and I met first thing in the morning prior to others getting to work. As usual, we both arrived in the office earlier than most. Margie reported that while David Braedden, Blair and herself were working the conference floor, she was introduced for the first time to Steven Gonzalez. Steven was there to assist at the conference as an expert on the OCC closing that was a subject of conversation at the conference. Margie stated that Steven openly stared at her to the point of making it uncomfortable. While on the conference floor, he rubbed her arm and back multiple times. Margie said that David noticed this and tried to make her feel more comfortable. Immediately following was the reception, Blair, Steven and Angel had a few drinks. Steven became more agressive and touched her more often. Riding back to the hotel in the car with Blair and Steven, Margie felt uncomfortable. Steven was driving but she felt both had had too much to drink to drive. Blair asked Margie if she had brought her bikini. Margie felt this was out of the blue and it made her very uncomfortable. There was a comment made about going to a hottub. Margie said she did not know how to respond. The two were going to head to another destination and Margie said she wanted to go to the hotel. As they were dropping Margie off, Steven got out to help her with her bag. Steven touched her again and kissed her cheek. She did not see Steven again and no references to the events were made by Blair. I told Margie that Iwas very sorry she felt uncomfortable and that we took this type of thing very seriously and I would be following up. She said she did not want to be the only woman aroung Steven going forward. I toid her that would be very unlikely. Margie asked if Blair would know and I told her that we would be speaking with him in our efforts to make sure that Servitas was a place where our employees felt comfortable. She said she understood and greatful that she worked for a company that cared. I did speak with David and he confirmed that he saw Steven touch Margie multiple times. He stated that he and Angel drove back from the reception in a different car. This information was shared with Rafael. Rafael did confirm that the incident was appropriately addressed with both individuals.

**REPORTED TO: (If Applicable)**
*Check all that apply

| | | | | |
|---|---|---|---|---|
| | Ambulance | | Yes / No | Transported to hospital |
| | Fire Department | | Yes / No | Arrest |
| | Police (Local) | | | Distination Location |
| | Police (College/University) | | | |
| | Medical | | | |

**PEOPLE INVOLVED: (If Applicable)**

| Name | Phone Number |
|---|---|
| Margie Escamilla | |
| Blair Tavenner | |
| Steven Gonzalez | |

SERV-198879

**WITNESSES: (If Applicable)**

| Name | Phone Number |
|---|---|
| David Braedden | |
| | |
| | |
| | |

| | | | |
|---|---|---|---|
| Sumbitted By: | Denise Hauck | Reviewed By: | Denise H |
| Title: | SVP Administration and Asset Management | Title: | Director of Human Resources |
| Signature/ Date: | 11/21/2018 | Signature/ Date: | |

SERV-198880

FILED
DALLAS COUNTY
8/7/2017 10:07 AM
FELICIA PITRE
DISTRICT CLERK
Jesse Reyes

No. _____ DC-17-09547

| | | |
|---|---|---|
| **LYNDSEY JOHNSON,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | **_____ JUDICIAL DISTRICT** |
| **v.** | § | |
| | § | |
| **SERVITAS, LLC;  SERVITAS** | § | **DALLAS COUNTY, TEXAS** |
| **MANAGEMENT GROUP, LLC** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| | § | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff Lyndsey Johnson ("Plaintiff"), complaining of Defendants Servitas, LLC

and Servitas Management Group, LLC (hereinafter "Defendants" or "Servitas"), and for her causes of

action respectfully shows the Court as follows:

### I.

### DISCOVERY CONTROL PLAN AND CLAIM FOR RELIEF

1.      Discovery is intended to be conducted under Level 2 of T.R.C. P. 190.

2.      Pursuant to T.R.C.P. 47, Plaintiff seeks monetary relief over $200,000 but not more

than $1,000,000.

## II.

## DISCLOSURE REQUEST

3.      Pursuant to Tex. R. Civ. P. 194, Defendant is requested to disclose, within (50) days after service of this Original Petition, the information or material described in Tex. R. Civ. P. 194.2(a)-(l).

## III.

## PARTIES

4.      Plaintiff Lyndsey Johnson is an individual citizen of the State of Texas, who resides in Denton County. The last three numbers of Plaintiff's social security number are 348, and the last three numbers of Plaintiff's driver's license are 431.

5.      Defendant Servitas, LLC is a Texas limited liability company with its principal office in Dallas County. Servitas, LLC can be served with process by serving its registered agent, Rafael Figueroa, at 6363 N. Hwy. 161, Suite 500, Irving, TX 75039.

6.      Defendant Servitas Management Group, LLC is a Texas limited liability company with its principal office in Dallas County. Servitas Management Group, LLC can be served with process by serving its registered agent, Rafael Figueroa, at 5525 N. MacArthur Blvd., Suite 760, Irving, TX 75038.

## IV.

## JURISDICTION AND VENUE

7.      This court has jurisdiction because this controversy is based upon Chapter 21 of the Texas Labor Code, also known as the Texas Commission on Human Rights Act ("TCHRA").

PLAINTIFF'S ORIGINAL PETITION                                                                    PAGE 2

8.      Plaintiff exhausted her administrative remedies under the TCHRA by timely filing a

Charge of Discrimination with the Texas Workforce Commission's Civil Rights Division within 180

days of the adverse employment actions alleged herein.

9.      Plaintiff timely filed this lawsuit under the TCHRA within 60 days of receiving her

Right-to-Sue letter from the Texas Workforce Commission's Civil Rights Division.

10.     Venue for all causes of action stated herein lies in Dallas County, Texas because

Defendants' principal office is located in Dallas County, and all or a substantial part of the acts

alleged in this Petition occurred in Dallas County.

**V.**

**FACTUAL ALLEGATIONS**

11.     Rafael Figueroa is a married male and the owner and President of Defendants Servitas,

LLC and Servitas Management Group, LLC.

12.     Plaintiff is a 31 year-old single mother.

13.     Plaintiff began providing marketing services to Defendants in April of 2012 as an

independent contractor.

14.     Defendants then hired Plaintiff as Servitas' Director of Marketing in June of 2012.

15.     Plaintiff was a highly capable, hard-working, and loyal employee.

16.     In recognition of Plaintiff's talent and dedication, Defendants promoted Plaintiff to the

position of Vice President of Marketing in December of 2013.

17.     Upon her promotion, Plaintiff became Defendants' only female Vice Presidents.

18.     Figueroa treated Plaintiff differently from his male Vice Presidents and male

executives.

19.     For example, Figueroa allowed his male Vice Presidents and executives to participate in Defendants' 401K plan commencing with their date of hire and/or promotion. Figueroa, however, told Plaintiff that Defendants did not have a 401K plan and did not allow Plaintiff to enroll in Defendants' 401K. More than two years after her promotion to Vice President, Plaintiff learned that Defendants' male Vice Presidents and executives were participating in a 401K plan. Plaintiff then had to fight for over a year, until May of 2016, to get enrolled in Defendants' 401K plan.

20.     Figueroa also allowed his male Vice Presidents and executives the flexibility to perform regular, after-hours, and weekend work from their homes, but required Plaintiff and her female staff to perform their work on-site at Defendants' Dallas office.

21.     Figueroa enforced the requirement that Plaintiff perform her work at the office by penalizing Plaintiff on the rare occasions when Plaintiff had no choice but to work remotely, for example, when Plaintiff's daughter was hospitalized. Figueroa penalized Plaintiff by requiring Plaintiff to use her PTO (personal time off) on days when Plaintiff performed work outside of the office from her daughter's hospital room, yet did not require male Vice Presidents and executives to use PTO when they performed work outside of the office.

22.     Figueroa also objectified Plaintiff and failed to treat her with professional respect.

23.     Figueroa told Plaintiff on more than one occasion that she needed to attend meetings with potential clients because Defendants needed to have a "token woman" present at the client meetings.

24.     Prior to one client interview, Figueroa instructed Plaintiff to remove a sweater that she

was wearing that day because the sweater was, in his opinion, too bulky.

25.     At a number of client meetings, Figueroa relegated Plaintiff, despite her status as Vice President of Marketing, to a secretarial role of setting up the meeting room and handing out paperwork to the meeting attendees.

26.     On another occasion, Figueroa ordered Plaintiff to serve drinks and hor d'oeuvres to male executives on his private jet because Plaintiff was the only woman on the jet.

27.     During a company retreat, Figueroa insisted that Plaintiff apply his sunscreen to his back and his chest because Figueroa's wife was not there to do it for him.

28.     Figueroa also frequently told Plaintiff, who was blonde, that he needed a blonde woman to take on vacation to a deserted island without his wife knowing about it.

29.     The sexist manner in which Figueroa treated Plaintiff damaged Plaintiff's reputation amongst Defendants' executives and staff. Some of Plaintiff's colleagues believed that Plaintiff was receiving special attention and special treatment from Figueroa because she was a young, beautiful, and blonde woman, and, as a result, failed to give Plaintiff the same level of professional respect that her professional skills and her professional accomplishments otherwise warranted.

30.     Plaintiff, however, was in fact treated poorly by Figueroa, as he continually increased Plaintiff's workload and work hours, requiring Plaintiff to spend more and more time physically at Defendants' offices and away from her disabled, young daughter.

31.     In August of 2016, Plaintiff asked Chief Operating Officer Michael Short for permission to begin working a flexible part-time work schedule on October 1, 2016. Plaintiff told Short she was making the request due to the toll the stress of working excessive hours at the office

throughout 2016 had taken on her mental well-being.

32.     In August of 2016, Short verbally approved Plaintiff's request to work a flexible part-time schedule with some days spent at the office and some days spent working from home through remote VPN access.

33.     In September of 2016, however, Plaintiff's remote VPN access was shut down.

34.     Plaintiff learned from Defendants' IT staff that Defendants had decided to limited VPN access to Short and five male Vice Presidents.

35.     By October of 2016, Plaintiff was experiencing serious psychological and physical symptoms as a result of combined work and personal stresses. Plaintiff's diagnoses included anxiety, depression, insomnia, and high blood pressure.

36.     Defendants, however, refused to provide Plaintiff any type of temporary limited or flexible work arrangement.

37.     On October 6, 2016, Plaintiff told Defendants that she needed to file an "ADA disability claim" to take a medical leave of absence due to Defendants unwillingness to agree to a temporary limited or flexible work arrangement.

38.     Plaintiff personally met with Figueroa on October 6, 2016 due to discuss her need for reasonable accommodation.

39.     Figueroa told Plaintiff that she could be terminated due to her medical condition.

40.     Figueroa also told Plaintiff that her timing was very bad for him personally and bad for the company, and that she had "ruined" his day.

41.     On October 13, 2016, Defendants informed Plaintiff her position was not covered by

the Family and Medical Leave Act, and set a deadline of October 20, 2016 for Plaintiff to provide medical documentation to support her request for a reasonable accommodation.

42.     On October 20, 2016, Plaintiff provided the requested medical documentation in which Plaintiff's doctor stated that Plaintiff needed a remote and/or part-time work schedule on a temporary basis, with Plaintiff's condition to be re-evaluated in three to four weeks. Plaintiff's doctor did not state that Plaintiff needed a full leave of absence.

43.     On October 25, 2016, Defendants denied Plaintiff's requests for an accommodation in her position as Vice President of Marketing. Defendants instead told Plaintiff she either (a) terminate her employment with Defendants entirely in exchange for a one-time severance payment or (b) take a demotion to an administrative position with a 70% pay cut.

44.     On October 31, 2016, Plaintiff submitted a letter of complaint to Defendants asserting that Defendants were violating the ADA by failing to offer her any type of reasonable accommodation in her position as Vice President of Marketing, and retaliating against her for asserting her ADA rights.

45.     Plaintiff informed Defendants in her October 31, 2016 letter that Defendants had both misunderstood the medical documentation from her doctor and her requests for accommodation.

46.     Defendants at no time sought any clarification from Plaintiff's doctor.

47.      Defendants did not ask Plaintiff to see a doctor of their choosing for a second opinion.

48.     Defendants did not engage in a good faith interactive process with Plaintiff to see what accommodations could work for both Plaintiff and Defendants, but rather cited Federal case law to Plaintiff as a reason why Defendants did not have to accommodate Plaintiff.

49.     Defendants ultimately decided to require Plaintiff to either accept the demotion or the severance, or return full-time her position as Vice President of Marketing by November 7, 2016 with no accommodations of any kind.

50.     After visiting with her doctor, Plaintiff informed Defendants that she was medically unable to return to work full-time without accommodations by November 7, 2016.

51.     As of November 7, 2016, Defendants had afforded Plaintiff only eleven days of leave without pay and had failed to offer Plaintiff any option for working a temporary part-time or flexible work schedule in her position as Vice President of Marketing.

52.     On November 11, 2016, Defendants terminated Plaintiff's employment.

53.     Defendants have allowed male Vice Presidents and male executives to work flexible work schedules, work part-time work schedules, and take longer leaves of absences than the leave afforded to Plaintiff between October 21, 2016 and November 7, 2016 without terminating the employment of those male Vice Presidents and executives.

54.     Defendants denied Plaintiff reasonable accommodation for her disability because Plaintiff is a woman and because Plaintiff formally asserted her legal right to accommodation under the ADA.

## VI.

## FIRST COUNT

## <u>DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE</u>

55.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs and incorporates the same as if set forth at length herein.

56.     Plaintiff is a qualified individual with a disability

57.     Plaintiff put Defendants on notice of her disability by informing Defendants verbally and in writing about her disabling medical conditions and need for reasonable accommodation under the ADA and by applying for short-term disability benefits.

58.     Defendants' President Rafael Figueroa reacted in a threatening and aggressive manner when Plaintiff told him about her disability and need for accommodation. Figueroa told Plaintiff she could be fired for her medical condition and told Plaintiff that her timing was very bad for him personally and that she was ruining his day by raising her need for reasonable accommodation with him.

59.     Plaintiff's psychological impairments of depression, anxiety, insomnia and high blood pressure substantially impaired one or more of Plaintiff's major life activities, including the life activity of sleeping.

60.     Plaintiff's treating physician determined that Plaintiff, as a result of her impairments, required a reasonable accommodation from Defendants in the form of a temporary remote and/or part-time work schedule.

61.     The accommodations requested by Plaintiff from Defendants were reasonable and would not have caused any financial or other undue hardship to Defendants' business operations.

62.     As an employer covered by Chapter 21 of the Texas Labor Code, Defendants were required to reasonably accommodate Plaintiff's disability and engage in an interactive process with Plaintiff in a good faith attempt to implement reasonable accommodations that would work both for Plaintiff and Defendants.

PLAINTIFF'S ORIGINAL PETITION                                                    **PAGE 9**

63.     Defendants, however, violated Plaintiff's rights as an employee with a disability by refusing to afford Plaintiff a remote or part-time work schedule for any length of time, forcing Plaintiff onto a leave of absence, and then summarily terminating Plaintiff after she had taken only three weeks of medical leave.

64.     Plaintiff's disability, and her request for accommodation, was a motivating factor in Defendants' decision to terminate Plaintiff's employment.

65.     As a result of Defendant's unlawful employment practices, Plaintiff has suffered damages including back pay, front pay, loss of insurance and benefits, psychological harm, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

66.     Plaintiff has also incurred and will continue to incur costs in seeking to protect and enforce her rights, including continuing psychological counseling, court costs and attorney fees.

**VII.**

**SECOND COUNT**

**SEX DISCRIMINATION IN VIOLATION
OF CHAPTER 21 OF THE TEXAS LABOR CODE**

67.     Plaintiff incorporates the allegations contained in the preceding paragraphs and incorporates by reference.

68.     Plaintiff is an employee within the meaning of Chapter 21 of the Texas Labor Code.

69.     Defendants are employers within the meaning of Chapter 21 of the Texas Labor Code.

70.     Chapter 21 of the Texas Labor Code prohibited Defendants from discriminating against Plaintiff based on her sex.

71.     Defendants discriminated against Plaintiff based on her sex (female) in the terms and

conditions of her employment by refusing to allow Plaintiff to work remotely or on a limited schedule while granting such flexibility to similarly-situated male employees.

72.    Defendants discriminated against Plaintiff based on her sex (female) by terminating Plaintiff after a three week leave of absence while permitting similarly situated male employees to return to work after taking three or more weeks off work.

73.    Defendants also discriminated against Plaintiff based on her sex by allowing Servitas' male President to objectify, demean, and marginalize Plaintiff and other women in the office based on their sex.

74.    Plaintiff's sex, female, was a motivating factor in Defendants' decision to deny Plaintiff reasonable accommodation, and to terminate Plaintiff on November 11, 2016.

75.    As a result of Defendant's unlawful employment practices, Plaintiff has suffered damages including back pay, front pay, loss of insurance and benefits, psychological harm, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

76.    Plaintiff has also incurred and will continue to incur costs in seeking to protect and enforce her rights, including court costs and attorney fees.

## VIII.

### THIRD COUNT

### RETALIATION IN VIOLATION
### OF CHAPTER 21 OF THE TEXAS LABOR CODE

77.    Plaintiff incorporates the allegations contained in the preceding paragraphs and

incorporates by reference.

78.     Plaintiff engaged in protected activity when she requested a reasonable accommodation under the ADA and when she asserted in her letters submitted to Defendants that Defendants were violating her ADA rights.

79.     Before Plaintiff made her formal request for accommodation under the ADA, Defendants' Chief Operating Officer ("COO") Michael Short had agreed to allow Plaintiff to work a flexible work schedule partially from home and partially from the office from October 1, 2016 through the end of 2016.

80.     Plaintiff's protected activity was a motivating favor in Defendants' decision to deny that its COO had ever approved Plaintiff for a flexible work schedule, to deny Plaintiff reasonable accommodation, to offer Plaintiff a demotion to an administrative position with a draconian cut in pay, and to terminate Plaintiff's employment on November 11, 2016.

81.     As a result of Defendant's unlawful employment practices, Plaintiff has suffered damages including back pay, front pay, loss of insurance and benefits, psychological harm, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

82.     Plaintiff has also incurred and will continue to incur costs in seeking to protect and enforce her rights, including court costs and attorney fees.

## IX.

## <u>JURY DEMAND</u>

83.     Plaintiff Lyndsey Johnson demands a trial by jury on all of her causes of action.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendants be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendants, jointly and severally:

1.  Judgment for back pay and front pay and all past and future lost fringe benefits;

2.  Judgment for actual damages in the amount of past and future lost earnings and benefits, and damages to past and future earnings capacity;

3.  Compensatory damages for past and future mental anguish, including psychological and emotional harm, Plaintiff has experienced and endured as a result of the discriminatory actions of Defendant;

4.  The costs and expenses incurred by Plaintiff in seeking new employment;

5.  Damages for the harm caused to Plaintiff's reputation;

6.  Prejudgment and postjudgment interest at the maximum legal rate;

7.  Attorneys' fees;

8.  Expert's fees;

9.  All costs of court; and

10. Such other and further relief to which Plaintiff may be justly entitled.

Dated: this 7th day of August, 2017.                    Respectfully submitted,

                                                        TREMAIN ARTAZA PLLC

                                                        */s/ Christine A. Hopkins*
                                                        Christine A. Hopkins
                                                        Texas State Bar No. 24095768

PLAINTIFF'S ORIGINAL PETITION                                              **PAGE 13**

4925 Greenville Avenue, #200
Dallas, TX 75206
christine@tremainartaza.com
Telephone:  469-573-0297
Facsimile:   214-254-4941

**ATTORNEY FOR PLAINTIFF**
**LYNDSEY JOHNSON**

Saturday, November 14, 2020 at 5:09:40 PM Central Standard Time

| | |
|---|---|
| **Subject:** | RE: Follow Up |
| **Date:** | Thursday, February 21, 2019 at 10:48:51 AM Central Standard Time |
| **From:** | Diana Diaz <DDiaz@servitas.com> |
| **To:** | Margie Escamilla <mescamilla@servitas.com>, Denise Hauck <dhauck@servitas.com>, Trey Verbick <tverbick@servitas.com> |
| **Attachments:** | image001.png |

Hi Margie,
Lets plan for 11:30am; we'll meet in the small conference room.
Thanks!

# Diana Diaz
O: 972.759.1643

# SERV:TAS
**COLLEGIATE REAL ESTATE SERVICES**

**From:** Margie Escamilla <mescamilla@servitas.com>
**Sent:** Thursday, February 21, 2019 7:33 AM
**To:** Denise Hauck <dhauck@servitas.com>; Trey Verbick <tverbick@servitas.com>; Diana Diaz <DDiaz@servitas.com>
**Subject:** Re: Follow Up

Thank you.

Thanks,
# Margie Escamilla
Marketing Coordinator

**From:** Denise Hauck <dhauck@servitas.com>
**Date:** Wednesday, February 20, 2019 at 9:44 PM
**To:** Margie Escamilla <mescamilla@servitas.com>, Trey Verbick <tverbick@servitas.com>, Diana Diaz <DDiaz@servitas.com>
**Subject:** Re: Follow Up

Margie

I have meetings scheduled from 930 until possibly 11 tomorrow morning. I leave for Louisiana around 230. I will get with Trey and Diana in the morning to see what their schedules look like and pick a time we can all meet. One of them will let you know in the morning.

Thanks.

**Page 1 of 2**

Denise

DENISE HAUCK
Senior Vice President
Administration and Asset Management
SERVITAS, LLC
972-759-1606 | 214-604-4330 (mobile)
5525 N. MacArthur Blvd.
Suite 760 Irving, TX 75038
servitas.com


-------- Original message --------
From: Margie Escamilla <mescamilla@servitas.com>
Date: 2/20/19 9:13 PM (GMT-06:00)
To: Trey Verbick <tverbick@servitas.com>, Diana Diaz <DDiaz@servitas.com>, Denise Hauck
<dhauck@servitas.com>
Subject: Re: Follow Up


I would like to meet with the three of you to discuss in detail what actions were taken in regards to the
incident that happened at CCLC.

Let me know your availability and I will set a meeting invite.

Thanks,
Margie

On Feb 20, 2019, at 3:58 PM, Trey Verbick <tverbick@servitas.com> wrote:

> Margie, I have been assured action was taken in response to the incident that took place while
> you were attending the CCLC Convention.  Additionally, I have spoken to Carmen about her
> actions and she has been counseled in the proper manner to handle these situations and type
> of information.  I hope that her sincere apology to you will start the rebuilding of your trust in
> her.
>
> We don't anticipate having any visitors tomorrow and I look forward to seeing you back in the
> office tomorrow.
>
> **Trey Verbick**
> Chief Information Officer
> O: 972.759.1612 | C: 214.536.0668 | E: tverbick@servitas.com
> 5525 N. MacArthur Blvd | Suite 760 Irving, TX 75038
> <image001.png>